■ Virgilio Aviles, Sr., Appellant, v Crystal Management, Inc., et al., Respondents, et al., Defendants. (And a Third-

Party Action.) [677 NYS2d 330] —Order, Supreme Court, Bronx County (Stanley Green, J.), entered May 14, 1997, which granted defendants' motion for summary judgment dismissing the complaint, affirmed, without costs.

The motion court properly held that the residential portion of the building from which plaintiff's decedent, a window washer, fell, did not constitute a "mercantile establishment" within the meaning of Labor Law § 2 (11), as that law existed in 1922 when the subject premises underwent renovation. Accordingly, the rules then applicable to mercantile establishments, among them rule 5 of the New York Industrial Code of 1920, requiring the provision of safety devices for the protection of window cleaners, did not affect the premises in question much less give rise to the continuing proprietary obligation upon which plaintiff would premise his recovery (*see,* Administrative Code of City of NY §§ 27-127, 27-128).

Nor do we reach plaintiff's argument, raised for the first time on appeal, that liability in this case could be properly premised exclusively upon defendants' breach of their general duty of care pursuant to Multiple Dwelling Law § 78 (1) to maintain the pre-existing window anchors in good repair. Even were we to reach it and assuming arguendo such a breach, plaintiff, in order to recover, would still have had to plead and prove all of the elements of common-law negligence, including, of course, that the asserted breach caused decedent's injury (*see, Juarez v Wavecrest Mgt. Team,* 88 NY2d 628, 644; *compare, Shkoditch v One Hundred & Fifty William St. Corp.,* 17 AD2d 168, 169, *affd* 16 NY2d 609, *with Pollard v Trivia Bldg. Corp.,* 291 NY 19, 22-23). Here, however, the record shows that decedent, an experienced window cleaner equipped with a safety belt, deliberately unhooked his safety belt and attempted to work without any support or safety equipment while standing on a four-inch ledge three stories above the ground. Under these circumstances, the IAS Court correctly determined that decedent's own unforeseeable conduct was the superseding cause of his injury (*see, Wright v New York City Tr. Auth.,* 221 AD2d 431, *lv denied* 88 NY2d 806; *Lionarons v General Elec. Co.,* 215 AD2d 851, *affd* 86 NY2d 832).

"[A]lthough virtually every untoward consequence can theoretically be foreseen * * * the law draws a line between remote possibilities and those that are reasonably foreseeable" (*Di Ponzio v Riordan,* 89 NY2d 578, 583). The dissent's conclusion, that it is foreseeable that the only alternative for a residential tenant unwilling to live with immovable, dirty windows is to hire somebody to stand outside on the sill to clean them,

stretches the envelope of foreseeability beyond reason. That it was found to be arguably foreseeable that a tenant would go out on a fire escape to clean the windows of her apartment (*see, Kellman v 45 Tiemann Assocs.*, 87 NY2d 871) does not reasonably lead to the dissent's conclusion that it was foreseeable that decedent, contrary to the sign posted in the building's lobby prohibiting "the cleaning of windows from the outside by tenants or their employees", would climb out the third floor apartment's living room window and, detaching his safety belt, attempt to clean the center window by standing on the narrow window sill while holding onto the window frame with one hand. Concur—Nardelli, J. P., Tom, Mazzarelli and Andrias, JJ.

Saxe, J., dissents in a memorandum as follows: On a late summer afternoon in 1988, plaintiff's decedent Julio Aviles, a 27-year-old self-employed window washer, began a routine window-washing job for the tenants of apartment 3C at 241-245 West 54th Street in Manhattan. He brought along his own window-cleaning equipment, including a safety belt that was designed to be attached to anchors or hooks embedded in the outside wall of the building. However, only one anchor remained intact outside the living room windows of apartment 3C; the rest were missing.

According to the plaintiff, the top sashes of the apartment's living room windows, which were designed to slide down along the window frame, were painted shut or otherwise immovable. Therefore, the windows could not be fully cleaned except from the outside. Initially, decedent attached his safety belt to the one anchor remaining in place outside the left front window of the apartment. Unable to complete the center window from that position, he detached his safety belt and tried to clean it by standing on the four-inch outside window sill while holding onto the window frame with one hand. He fell from this perch, suffering serious injury.

A sign had been posted in the lobby of the building stating, "The law prohibits the cleaning of windows from the outside by tenants or their employees," but there is also evidence that decedent had cleaned windows in this tenant's apartment on at least one earlier occasion.

The motion court granted the defendants' motion for summary judgment dismissing the complaint, essentially holding that no statutory or common-law duty was owed to the decedent by the defendants. I disagree and would reverse.

It is a fundamental axiom of tort law that a cause of action based on negligence requires several elements to be established:

(1) that the defendant owed the plaintiff a duty to conform to a certain standard of conduct for the protection of others against unreasonable risks, (2) that the defendant breached that duty by failing to conform to the required standard, (3) that this conduct was a proximate cause of the plaintiff's injuries, and (4) that the plaintiff suffered actual loss or compensable damages (*see generally*, Prosser and Keeton, Torts § 30, at 164-165 [5th ed]).

Here, the critical issue is whether the owner of the building owed any duty to the window cleaner hired by a tenant. Whether or not a duty exists is an issue of law for the court (*Eiseman v State of New York*, 70 NY2d 175).

The motion court based its dismissal of the action on the absence of any required duty on the part of the landlord. With respect to the existence of a statutory duty, I agree that although several statutes require owners of certain types of buildings to install anchors for the protection of window washers, none of those laws applies to the circumstances presented here. For instance, Labor Law § 202, which requires the owner, lessee, agent and manager of every public building to provide safe means for the cleaning of windows, only applies to buildings of more than six stories; the building at issue is just four stories high. Rule 5 of the Industrial Code of 1920 only applies to "mercantile", not residential, establishments; this building is "mercantile" only in part, i.e., on the first floor where the commercial units are located.

However, even in the absence of any statutory violation, a negligence claim may still be established under the common law (*see, Kellman v 45 Tiemann Assocs.*, 87 NY2d 871; *Lesocovich v 180 Madison Ave. Corp.*, 81 NY2d 982; *Gallagher v St. Raymond's R. C. Church*, 21 NY2d 554, 557).

The existence of a tort duty is often a nettlesome issue. "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another" (Prosser and Keeton, Torts § 53, at 356 [5th ed]). "No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists" (*id.*, at 359).

In order to determine when it is appropriate to impose a duty, it is instructive to consider the well-known formula proposed by Judge Learned Hand in *United States v Carroll Towing Co.* (159 F2d 169, 173). For a common-law duty to exist, he suggested, the cost of preventing injury must be less than the product of the foreseeability of injury times the grav-

ity of the harm (see, *United States v Carroll Towing Co.*, *supra*, at 173).

The cost to the landowner of preventing the type of injury suffered by Julio Aviles is moderate. It does not necessarily involve installing and maintaining window anchors; rather, it may simply entail maintaining windows in such condition that they may be fully cleaned from inside the apartment.

The gravity of the harm likely to result from a fall from a third, fourth, fifth or sixth story window is obvious.

As to the foreseeability of harm, I believe it to be substantial. It is reasonable to expect that most residential tenants will want their apartment windows cleaned frequently, not only for aesthetic reasons but also for reasons of hygiene. If the windows can all be opened and it is possible to clean their exterior without any need to stand outside the window, the risk of harm to the person cleaning the window is minimized. But, frequently it is not possible to clean the exterior windows from inside the apartment.

In residential apartments in New York City, it is the landlords who, by operation of law, are required to regularly paint the apartments they lease (see, Administrative Code of City of NY § 27-2013 [b] [2]), and the painters they employ are not always meticulous in accomplishing this task. Windows are frequently painted shut, so that the tenant cannot cut through the layers of paint without doing damage to the window frame. Additionally, in older buildings such as this one, the condition of old wooden window frames can also cause sticking conditions that render the windows immovable.

While residential landlords are required to paint, they have no responsibility to clean the exterior of the apartments' windows. This obligation is left to each tenant. Yet, an individual tenant lacks the authority or the resources to erect any large-scale safety equipment for the protection of window washers. The type of equipment provided for commercial building-wide window cleaning, such as scaffolding or platforms lowered from the roof, is prohibitively expensive on a smaller scale.

A residential tenant in a Manhattan apartment where windows are immovable must therefore either live with filthy windows or hire somebody to stand outside on the sill to clean them. At least where the landlord is aware of the immovable window sashes, it can come as no surprise to the landlord that in fact tenants will hire window cleaners who will stand outside the sill to perform this work, therefore creating the likelihood of injury to themselves. The severity of the potential injury is enormous, while the burden of avoiding the risk is relatively

minor. In view of all these factors, imposition of a common-law duty is appropriate.

To impose a duty upon the landlord in these circumstances comports with the general common-law principle that a landowner has a paramount duty to maintain its premises " 'in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden of avoiding the risk' " (*Kellman v 45 Tiemann Assocs., supra*, at 872, quoting *Basso v Miller*, 40 NY2d 233, 241; *Smith v Arbaugh's Rest.*, 469 F2d 97, 100).

In accordance with this principle, in *Kellman v 45 Tiemann Assocs.* (87 NY2d 871, *supra*), the Court of Appeals affirmed a denial of summary judgment, recognizing as applicable the duty of a landlord to maintain the premises in a safe condition, where a tenant had fallen from a fire escape landing that lacked safety railings around the stairway opening. The Court held that *regardless of the applicability of any statute or regulation to the situation*, questions of fact were presented as to "(1) whether it was foreseeable that tenants would use the fire escape landings to clean windows or for other purposes, and, if so, (2) whether defendant landlord exercised reasonable care to protect tenants from injuring themselves by falling through the unguarded hatchways in fire escape landings" (87 NY2d, *supra*, at 872).

Similarly, in *Lesocovich v 180 Madison Ave. Corp.* (81 NY2d 982, 985, *supra*), a building tenant and his guests had gained access to the adjacent roof of a one-story portion of the three-story building through a window in the tenant's apartment; the plaintiff, a guest of the tenant, had fallen from the roof. He claimed that the failure to install a railing or parapet around the roof constituted negligence on the part of the landlord. The Court of Appeals denied the owner's motion for summary judgment, noting that there were triable issues of fact as to, *inter alia*, "(1) whether defendant exercised reasonable care to prevent the use of or access to the roof and porch, [and] (2) whether it was foreseeable that persons might use the roof and porch for outdoor recreational purposes" (*supra*, at 985). Although in *Lesocovich*, unlike the present case, the landlord had made no attempt to warn against the danger (the use of the roof), the mere presence of a warning cannot serve to avoid compliance with a duty of protection which otherwise exists (*see, Pollard v Trivia Bldg. Corp.*, 291 NY 19, 24).

The motion court reasoned that the plaintiff's decedent's decision to stand on the sill despite the obvious danger supplied grounds for the dismissal. In doing so, the court was, in effect,

applying a standard used in the context of the assumption of risk doctrine. At one time the facts presented here would have precluded a finding of liability, under that doctrine (*see, e.g., Dougherty v Pratt Inst.*, 244 NY 111 [where a window cleaner was injured in a fall when working where no hooks were present, his common-law claim was dismissed on grounds of assumption of risk]). However, New York's adoption of a comparative negligence approach (CPLR 1411) has fundamentally altered the application of the assumption of risk doctrine (*see, Arbegast v Board of Educ.*, 65 NY2d 161, 170 ["CPLR 1411 requires *diminishment* of damages in the case of an implied assumption of risk" (emphasis added)]).

Now, although the phrase "assumption of risk" continues to be discussed in instances where the plaintiff voluntarily participated in inherently risky *athletic* activities, the analysis is based upon the reasoning that under such circumstances the owner of the facility or arena owes no duty to the plaintiff. This is because " 'assumption of risk * * * is really a *principle of no duty*' " (*Morgan v State of New York*, 90 NY2d 471, 485, quoting Prosser and Keeton, Torts § 68, at 496-497 [5th ed]). When voluntarily participating in sporting events, " 'the plaintiff, in advance, has given his * * * consent to relieve the defendant of an obligation of conduct toward him, and to take his chances of injury from a known risk arising from what the defendant is to do or leave undone' " (*Turcotte v Fell*, 68 NY2d 432, 438, quoting Prosser and Keeton, Torts § 68, at 480 [5th ed]). "If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and defendant has performed its duty" as long as the owner of the premises has ensured that the conditions are as safe as they appear to be (*Morgan v State of New York*, 90 NY2d 471, 484, supra).

However, the cases that limit the duty of the owner or operator of such a facility to ensuring that the arena is as safe as it appears to be are careful to confine their discussion and holding to sport or recreational facilities (*see, Morgan v State of New York, supra; Turcotte v Fell*, 68 NY2d 432, *supra*). The Court of Appeals in *Morgan* explained that "in assessing whether a defendant has violated a duty of care *within the genre of tort-sports activities and their inherent risks*, the applicable standard should include whether the conditions caused by the defendants' negligence are 'unique and created a dangerous condition over and above the usual dangers that are inherent in the sport' " (90 NY2d, *supra*, at 485 [emphasis added], quoting *Owen v R.J.S. Safety Equip.*, 79 NY2d 967, 970).

The plaintiff's "freely given" consent to the risk is central to the analysis: "Risks in this category [of sporting events] are incidental to a relationship of free association between the defendant and the plaintiff in the sense that either party is perfectly free to engage in the activity or not as he wishes. Defendant's duty under such circumstances is a duty to exercise care to make the conditions as safe as they appear to be. If the risks of the activity are fully comprehended or perfectly obvious, plaintiff has consented to them and\defendant has performed its duty." (*Turcotte v Fell, supra,* at 438-439.)

It is for good reason that the reach of these case holdings is limited to sports facilities. Sports activities, whether at the amateur or the professional level, are fundamentally recreational. Regardless of whether the participants are paid, their activities are not necessary to the essential functions of society. Sports are also inherently risk-laden, whether those risks are taken by a professional athlete, as part of his employment (*see, e.g., Maddox v City of New York,* 66 NY2d 270), or by an amateur, voluntarily.

An analysis applicable to persons involved in such risky, recreational activities, paid or unpaid, should not be automatically applied to persons undertaking the necessary tasks of society. With regard to window cleaners, the analysis of the sporting arena is particularly inapt. Julio Aviles, attempting to earn his living by cleaning windows, simply cannot be said to have been "free to engage in the activity or not as he wishes" (*Turcotte v Fell,* 68 NY2d, at 438-439, *supra*). He certainly has not consented to the apparent danger in the same manner as an individual voluntarily participating in a recreational activity. Nor can his situation be equated with that of the professional athlete, who undertakes inherently risky activities as part of his employment. The dangers of window cleaning, unlike those of professional sports, can be—and generally are—removed or minimized by available safety precautions.

In circumstances such as these, it is inappropriate to eliminate the property owner's general duty to maintain the premises in a safe condition in view of the circumstances, or to limit that duty to merely ensuring that there are no hidden defects.

The obvious nature of the danger of standing on the outside window ledge without a safety device, therefore, does not end the analysis. Rather, it is simply one fact for the jury to consider in determining the reasonableness of the plaintiff's own conduct, for purposes of a finding of comparative negligence.

Furthermore, the absence of a duty to *warn* against a danger or condition that is readily observable (*Johnson v Summa*, 230 AD2d 633) does not abrogate the landlord's paramount duty to maintain the premises in a reasonably safe condition in view of the circumstances, as is clear from the *Kellman* case (87 NY2d 871, *supra*). The absence of a railing around the stairway opening was no less obvious there than the absence of window anchors here.

Even if the imposition of a duty on landowners in these circumstances is viewed as a new development in our law, it is merely a natural extension of the established common law, which is "a living organism which grows and moves in response to the larger and fuller development of the nation" (*Oppenheim v Kridel*, 236 NY 156, 164). "This flexibility and capacity for growth and adaptation is the peculiar boast and excellence of the common law" (*Hurtado v California*, 110 US 516, 530). The case of *Gallagher v St. Raymond's R. C. Church* (21 NY2d 554, 557, *supra*) illustrates this point.

A long-established common-law doctrine held that a building owner had no duty to illuminate an exterior stairway with artificial light in the absence of defective conditions or conditions of peculiar danger (*see, McCabe v Mackay*, 253 NY 440; *Kiernan v Roman Catholic Church of St. John the Evangelist*, 11 AD2d 997, *affd* 10 NY2d 853). The rule was originally formulated in the age of the gas light, when "[t]he use of even gas lighting in the interior of buildings was far from universal, while electric lighting of public streets had barely started. The immense quantity of electricity needed to light our cities, towns and villages was still not readily available at low cost" (*Gallagher v St. Raymond's R. C. Church*, 21 NY2d 554, 557, *supra*).

The plaintiff in *Gallagher (supra)* was leaving the defendant's parish school building at 11:15 P.M. after a meeting. The exterior lights had already been turned off, and, in the dark, while feeling for the handrail, she lost her footing and fell from the landing, injuring herself.

The Court in *Gallagher* noted that over the years, various statutes and regulations had been enacted requiring certain kinds of buildings to install exterior lighting, although none of them was applicable to the type of building where Ms. Gallagher's accident had occurred (21 NY2d, *supra*, at 558). Citing society's changed standards with regard to exterior lighting, *despite the lack of a statute or regulation applicable under the circumstances,* the Court imposed upon the defendant a duty to maintain exterior lighting while people remained on the

premises, and therefore reinstated a jury verdict which had been overturned by the Appellate Division (*supra*, at 558). In doing so it explained that "The legislative process has pointed the way. We choose to follow because we recognize that the common law of this State is not an anachronism, but is a living law which responds to the surging reality of changed conditions. We, therefore, do not hesitate to purify our law of what has, with the passage of time, become a most anomalous exception to the general common-law rule of due care." (*Supra*, at 558.)

The existence of statutes applicable in similar situations to protect window washers is relevant to our analysis here. It reflects the expectation of our society in general that windows will be regularly cleaned, and additionally that we consider and protect the safety of those hired to do the cleaning.

It is therefore proper and equitable to impose upon residential landlords in smaller buildings, to which Labor Law § 202 does not apply, a duty to ensure that the windows of their apartments can be fully cleaned in a safe manner.

Finally, although the motion court cited *Palsgraf v Long Is. R. R. Co.* (248 NY 339), the holding of that case—that if the injury to the plaintiff was not foreseeable, the defendant can have had no duty toward that plaintiff—is irrelevant to the issues that must be decided here. While the absence of foreseeability will cut off any duty that otherwise exists (*see, e.g., Malloy v Delk Transmission*, 191 AD2d 303, *lv denied* 82 NY2d 657), there is sufficient evidence here to leave to the trial jury the issue of foreseeability.

Accordingly, I would reverse, deny the motion and reinstate the complaint, concluding on the basis of the facts alleged that plaintiff has made a prima facie showing that the defendants violated a common-law duty, and that questions of fact remain as to all other issues relating to the claim of negligence.